James Bowermeister appeals from a judgment extending his duty to support his child beyond the age of majority. Bowermeister contends that the trial court's decision must be reversed because the trial judge exhibited bias, and because the judgment is against the manifest weight of the evidence. Bowermeister also contends that the trial court's reliance on Castle v. Castle
(1984), 15 Ohio St.3d 279, was misplaced because that case has been legislatively overruled by R.C. 3109.05(E).
We conclude that the record does not support a conclusion that the judgement was the product of the trial judge's bias and prejudice. We further conclude that the judgment is supported by the evidence. Finally, we find that R.C. 3109.05(E) has not overruled the holding in Castle.
Accordingly, the judgment of the trial court is Affirmed.
 I
Plaintiff-appellant James Bowermeister and defendant-appellee Elana Bowermeister, now Shanks, were divorced in 1980 by a decree entered in the Greene County Common Pleas Court. The parties had one child of the marriage, Bradley Bowermeister, born November 28, 1979. Bowermeister paid twenty dollars per week as child support pursuant to the decree of divorce from 1980 until 1995, when the amount of support was administratively increased to $338.60 per month.
On July 23, 1998, Bowermeister notified the Greene County Child Support Enforcement Agency of the fact that Bradley had graduated from high school and that he had turned eighteen. In response to the notification, the agency referred the matter to the Greene County Common Pleas Court for a determination regarding Bradley's emancipation. Shanks notified the court that she intended to contest the issue of emancipation pursuant to the holding in Castle v. Castle (1984), 15 Ohio St.3d 279.[1]
A hearing was held in the trial court. The following facts were adduced during the hearing. Bradley Bowermeister was born with spina bifida; a condition which causes him to suffer from paralysis in his lower extremities. Bradley is also hydrocephalic. This condition requires him to maintain a shunt, which helps to drain fluid from the brain and to maintain correct pressure on the brain. Bradley is confined to a wheelchair. He must have aid with his bowel movements, in the form of enemas administered by another person. He also has to be catheterized four times every day in order to urinate. Bradley has undergone multiple surgeries since birth, including one on his brain in 1995. Due to problems with his spine, Bradley's spine was surgically fused when he was eight years old; his trunk has not grown since that time and thus, he is only five feet tall. Bradley suffers from pressure sores, which must be cared for by another person. He also suffers from intermittent, but daily, problems with his eyes. According to the testimony, Bradley has never worked. The testimony indicates that Bradley had received Social Security (SSI) benefits from approximately 1981 until approximately 1988. At the time of the hearing, he was attending Wright State University, where he wanted to major in communications. He was also enrolled at the Bureau of Vocational Rehabilitation (BVR). According to the testimony, Bradley's purpose in attending BVR is to attain skills toward the goal of obtaining employment.
The undisputed testimony indicates that Bradley can bathe and feed himself. He has full use of his arms. He can drive himself to and from school in a specially equipped van which was bought by his mother and stepfather and equipped by BVR. However, he cannot shop for groceries on his own, he cannot wash dishes or do housework, and he has some mobility problems associated with school attendance. Bradley testified that he hopes to find employment after graduation. However, he testified that, as of the date of the hearing, he was not capable of employment
The trial court, in rendering its decision, relied upon the holding in Castle, supra, and found that Bradley requires "ongoing assistance from his family to help him with elimination, hygiene, cooking, housekeeping and food preparation." The trial court further found that due to his physical limitations, Bradley is not yet able to support himself. Therefore, the trial court ordered Bowermeister to continue making support payments until further notice from the court.
From this order, Bowermeister appeals.
 II
Bowermeister's First Assignment of Error is as follows:
 IT WAS AN ABUSE OF DISCRETION TO RULE IN APPELLEE'S FAVOR DUE TO THE JUDICIAL BIAS OF THE TRIAL COURT EVIDENCED BY THE COURT'S CONDUCT DURING THE HEARING.
Bowermeister contends that the "attitude exhibited by the Trial Court during the course of the hearing evidenced judicial bias." He claims that the trial court's bias was shown during the judge's questioning of Bradley and by a comment made by the judge at the conclusion of the hearing. He therefore contends that the trial court's decision was "motivated by factors other than the evidence presented before the Court," and therefore constitutes an abuse of discretion.
We turn first to the claim that the trial judge exhibited bias during his questioning of Bradley. The specific colloquy between the judge and Bradley to which Bowermeister directs our attention is as follows:
 Q: Okay. Who furnishes the funds that you use to buy gasoline to go to and from Wright State, to buy your own personal clothing, other than gifts at Christmas time, things of this nature? Okay, I would call this personal money, mad money. Who furnishes those sums of money?
A: My parents.
 Q: You're talking about your natural father and your mother and your stepfather, all the above, or none of the above, or just one of the above, or two of the above? You see, parents, that consists of step, the likewise, I assume.
A: Yes.
Q: Okay. So who does?
A: Well, for personal stuff, like clothes and stuff.
Q: Right.
A: My stepfather and my mother.
Q: Okay.
A: For just stuff.
 Q: Okay. How about gasoline, somebody gives you a credit card — I assume it's a credit card?
A: No, I (INDECIPHERABLE).
Q: (INDECIPHERABLE) pay currency?
A: Yes.
 Q: You're one of the few people in America that still pay currency for gasoline. Okay. As far as the food that you consume at Wright State, I'm talking about money, who gives you the money? Again, that's mother and stepfather?
A: Yes, we have money put away for that.
Q: For education and for —
A: For eating, food and gasoline.
 Q: Okay. I understand. Do you have any personal checking or savings account?
A: Yes, I do.
Q: Yes as to which one, both of them?
A: Yes.
Q: Come on, Brad, have you got a checking account?
A: Yes, I do.
Q: You have a savings account, too?
A: Yes.
Q: Got you. Are those active accounts that you use?
A: Yes.
Q: And you draw from them and put in, whatever?
A: Yes.
 Q: Okay. The money that went in to start those accounts, from what source was that?
A: Savings account was birthday, Christmas.
Q: Got you. Okay. All right.
A: And the savings, relatives started that up, so —
Q: Okay. This is your first quarter at Wright State?
A: Yes.
 Q: Have you gotten any grades yet? I mean, the question was asked of your mother by your father's lawyer what your grades were. I'm going to ask you. I mean, the wrong person to ask is the mother what kind of grades her kid is getting.
 Q: What kind of grades are you getting? Have you got any yet?
A: Yes, I have.
 Q: Okay. Good, bad, ugly? Let's be gentle since your folks are here. Okay?
Q: I will accept good, bad, or should be improved.
A: They're good.
 Q: Okay. The vehicle — I don't know why when you get to court a car becomes a vehicle — the car you drive, the van you drive, okay, who purchased that?
A: B.V.R. helped.
 Q: Okay. They helped with it. Who did the other help? Was there any money coming from your pocket? Your personal pocket, not your folks.
A: No.
 Q: Okay. Did any of the funds come from your mother, or stepfather, or your father or your stepmother.
A: I don't know.
 Q: Okay. Who pays the insurance? Who pays the insurance on the vehicle, the car?
A: I believe my parents do.
 Q: Okay. What days do you physically go to Wright State?
A: Tuesdays and Thursdays.
 Q: What occupies your time Monday, Wednesday and Friday?
A: Study.
 Q: That's the answer I was looking for. Okay. Good answer. You've been here before.
Bowermeister admits that this dialogue indicates that the trial judge was attempting to "arrive at some determinations about financial assistance for Bradley Bowermeister." He also admits that a trial judge does not abuse his discretion by questioning witnesses during a bench trial. However, he argues that "the manner in which the questions were asked, coupled with the manner in which the Court led the witness, makes one question whether the purpose of the examination was to place on the record answers necessary to sustain a decision pursuant to Cassel [sic]." He cites Canon 3 of the Ohio Code of Judicial Conduct as support for his claim.
We are mindful of a trial judge's obligation to perform his duties without bias or prejudice. CJC, Canon 3(B)(5). However, after reviewing the entire transcript and record, and after particularly scrutinizing the passage to which Bowermeister objects, we find no basis to conclude that the trial judge's behavior reveals bias, prejudice, or a lack of impartiality. To the contrary, our impression of the transcript is that the trial judge was conscientiously attempting to elicit factual information upon which to base his decision, in accordance with the holding inCastle, supra.
Bowermeister next contends that the trial judge exhibited bias when he made the following statement at the conclusion of the hearing:
 But in my opinion, and I rarely ever give an answer from the Bench, but in this case it's my opinion that Cassel versus Cassel [sic] does apply and that the support shall continue at this point in time until such time as Bradley Bowermeister becomes President of Media One. And I would hope he does so.
Bowermeister contends that this statement draws the objectivity of the trial judge into question. He also claims that it evidences a misinterpretation of the standard for child support, and thus shows that the trial court exceeded its authority; i.e., he argues that by this statement, the trial court has issued an order continuing child support until such time as Bradley obtains a specific job.
It is axiomatic that a trial court speaks only through its journal. Tremaine v. Tremaine (Feb. 7, 1997), Montgomery App. No. 16048, unreported, citing State ex rel. Fogle v. Steiner (1995),74 Ohio St.3d 158, 163. In this case, the trial court's order indicates that it did not misinterpret the standard set forth inCastle, supra. Instead, the decision clearly states that Bradley falls within the purview of Castle because of his physical disabilities. The order does not state that child support will continue until Bradley becomes "president of Media One." Instead, it merely states that the support shall continue "until further notice." Therefore, we cannot say that the trial judge's statement on the record indicates a misapprehension of the standard for child support in cases like this one.
Likewise, we cannot say that the trial judge's statement calls into question his objectivity. Again, the court's decision indicates that the judge, in reaching his decision, applied the law to the facts of this case. As noted in Part III, below, the decision is supported by the evidence. We cannot find any evidence to support a finding that the trial court failed to adhere to the law and that he instead allowed himself to be swayed by sympathy.
It would be absurd to construe the trial judge's comment on the record at the conclusion of the trial as intended to be taken literally that support would continue until and unless Bradley became the President of Media One, and we cannot imagine that anyone in the courtroom took it that way. It appears from the record that Bradley was present in the courtroom when the remark was made, and we are confident that it was intended to provide encouragement to Bradley that he can ultimately overcome his handicap and enjoy a fulfilling, productive life. We are sure that Judge Shattuck would terminate the support order even if Bradley were to fall somewhat short of the judge's high expectation and have to settle for becoming Governor of Ohio, for example.
Bowermeister's First Assignment of Error is overruled.
 III
In his Second Assignment of Error, Bowermeister alleges the following:
 THE TRIAL COURT'S DECISION WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE PRESENTED AT THE HEARING.
Bowermeister contends that the trial court's decision is against the manifest weight of the evidence. In support, he argues that the evidence presented by Shanks incorrectly focused on Bradley's physical disabilities rather than his financial capabilities. He also argues that the evidence regarding Bradley's receipt of social security benefits renders the evidence incredible. Finally, he contends that the evidence was not believable because it was provided by interested parties; specifically, Shanks, Bradley and Bradley's stepfather.
"Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Construction Co.
(1978), 54 Ohio St.2d 279, syllabus. "In considering whether the judgment of the trial court is against the manifest weight of the evidence, it is important that the reviewing court be guided by a presumption that the findings of the trier-of-fact are correct."Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 79-80. In reviewing a child support case, an appellate court must determine whether the trial court abused its discretion.Shanyfelt v. Shanyfelt (1997), 118 Ohio App.3d 243, 246. An abuse of discretion connotes more than an error of law or judgment, but rather implies that a decision is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
We begin with Bowermeister's claim that the evidence should have focused on Bradley's financial capabilities rather than his physical disabilities. In support, he refers to our opinion inDavis v. Davis (June 16, 1993), Clark App. No. 2974, unreported. In Davis, we remanded a child support matter to the trial court for a determination of a child's ability to support himself. Id.
Our decision was based upon the trial court's incorrect ruling that "any charitable assistance received [by the child] should be counted as part of his self-support." Id. We ordered the trial court, on remand, to consider the child's ability to support himself "through his own efforts, including entitlement programs [such as Social Security Disability Income assistance] to which [the child was] entitled to as a matter of right, without any subrogation against a parent obliged to provide support to him."Id.
Apparently, Bowermeister construes Davis as requiring a trial court to ignore an individual's physical disabilities when determining the ability to support oneself. We cannot agree with this interpretation. Instead, the ability to support oneself must be determined after a consideration of both mental and physical disabilities, as well as any entitlement to financial assistance. Contrary to Bowermeister's claims, the trial court was presented with evidence as to both issues. The evidence supports the finding that Bradley suffers from physical disabilities that render him incapable of supporting himself. As the trial court found, Bradley relies on his family for help with "elimination, hygiene, cooking, housekeeping and food preparation."
The evidence also supports a finding that, at this time in his life, Bradley is financially dependent. The testimony indicates that Bradley travels to school in a van purchased by his mother and stepfather and specially equipped by the Bureau of Vocational Rehabilitation. The testimony also indicates that BVR also helps Bradley with his education. Also, Bradley testified that money for school expenses such as food and supplies is provided by family members. Finally, the testimony indicates that Bradley is unemployed, and that he does not believe himself capable of employment without a college degree.
Next, we address Bowermeister's claim that Shanks' testimony that Bradley no longer receives social security benefits renders the evidence incredible. According to Bowermeister, "it stretches belief to believe that social security disability income would not be available to Bradley Bowermeister." He contends that the testimony requires the trier of fact to reach one of the following conclusions: (1) that Shanks' testimony is not credible; (2) that the failure of Bradley and Shanks to apply for social security disability assistance undermines the request for an extension of the term of support; or (3) that Bradley's disability must be questioned.
We note that the testimony merely indicated that Bradley had received Supplemental Security Income in the past; there was no testimony as to his entitlement to Social Security Disability benefits. Also, with regard to Shanks' testimony, we note that the trial court, as the trier of fact, was in the best position to determine her credibility. State v. Dye (1998), 82 Ohio St.3d 323,329, citation omitted. Shanks did not, as Bowermeister claims, state that S.S.I. benefits were not available. To the contrary, Shanks merely testified that Bradley had received S.S.I. benefits in the past, at a time when her income was around $12,000. She also testified that the benefits were later discontinued. Furthermore, the issue of whether Bradley had applied, or was required to apply, for Social Security Disability benefits was not raised in the trial court, and Shanks was not on notice that Bowermeister was asking the trial court to draw an inference concerning her credibility; had the issue been raised, Shanks might have offered an explanation concerning the apparent lack of Social Security Disability benefits. Therefore, based upon the record, we cannot say that the trial court erred in finding Shanks' and Bradley's testimony credible.
Finally, we turn to Bowermeister's contention that the evidence is not believable because it was presented by interested parties. The interest or bias of a witness is a matter for the fact finder to consider in determining credibility. Again, the trial court was in the best position to determine the credibility of the parties. The undisputed testimony supports the trial court's finding that Bradley is unable to care for himself and that he was unable to support himself as of the date of the hearing.
We conclude that the trial court's findings are supported by the evidence in the record. Accordingly, Bowermeister's Second Assignment of Error is overruled.
 IV
Bowermeister's Third Assignment of Error is a follows:
 THE JUDICIAL PRECEDENT OF CASSEL V. CASSEL [SIC], 15 O.S.3D 279 (1984) RELIED UPON BY THE TRIAL COURT HAS BEEN LEGISLATIVELY OVERRULED BY OHIO REVISED CODE SECTION 3109.05(E).
Bowermeister contends that in its modification of R.C.3109.05(E), enacted January 1, 1998, the General Assembly intended to overrule the holding of Castle v. Castle (1984),15 Ohio St.3d 279.
R.C. 3109.05(E), as amended, provides:
 Notwithstanding section 3109.01 of the Revised Code, if a court issues a child support order under this section, the order shall remain in effect beyond the child's eighteenth birthday as long as the child continuously attends on a full-time basis any recognized and accredited high school or the order provides that the duty of support of the child continues beyond the child's eighteenth birthday. Except in cases in which the order provides that the duty of support continues for any period after the child reaches age nineteen, the order shall not remain in effect after the child reaches age nineteen. Any parent ordered to pay support under a child support order issued under this section shall continue to pay support under the order, including during seasonal vacation periods, until the order terminates. (Emphasis added).
Bowermeister contends that "by stating straightforwardly that with the exception of orders providing for support duties beyond the age of 19, the order shall not remain in effect after the child reaches the age of 19, the court [sic] overturns the existing common law found in Cassel v. Cassel [sic]." We disagree.
As previously noted, in Castle, supra, the Ohio Supreme Court found a common-law duty to pay child support for children over the age of majority if they have physical or mental impairments precluding them from supporting themselves. We would not lightly infer a legislative purpose to overrule the holding that a parent may be required to support a child beyond the age of majority when the child is incapable, because of a severe physical or mental disability, of supporting himself or herself. Far from evincing a purpose to overrule Castle, the statutory text expressly acknowledges the possibility that child support may continue after the age of majority. The statute merely indicates that if support is to continue after the child turns nineteen, the order must so provide.
Bowermeister's Third Assignment of Error is overruled.
 V
All of Bowermeister's Assignments of Error having been overruled, the judgment of the trial court is Affirmed.
GRADY, P.J., and BROGAN, J., concur.
[1] The Ohio Supreme Court has held that "[t]he common-law duty imposed on parents to support their minor children may be found by a court of domestic relations having jurisdiction of the matter, to continue beyond the age of majority if the children are unable to support themselves because of mental or physical disabilities which existed before attaining the age of majority."Castle v. Castle (1984), 15 Ohio St.3d 279, paragraph two of syllabus.